**UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT**

RICHARD JOSEPH MOCKLER,      :
        Plaintiff,       :
                      :
        v.             :      Case No. 2:15-cv-227
                      :
NANCY A. BERRYHILL, ACTING    :
COMMISSIONER OF SOCIAL SECURITY   :
        Defendant.      :

**OPINION AND ORDER**

**I. Introduction**

Pursuant to 42 U.S.C. § 1383(c)(3), Plaintiff Richard Mockler seeks judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") denying his claim for supplemental security income ("SSI"). Mr. Mockler has not held any form of employment for over 20 years, and was supported by his ex-wife until his divorce. He lives an extremely reclusive lifestyle, interacting only with his mother in person and avoiding day-time excursions from his home to escape interacting with others. Since his divorce finalized in or around 2012, Plaintiff's depression and paranoia worsened. In addition, Plaintiff is morbidly obese and suffers from various types of chronic pain. He alleges that he is unable to work due to disabling mental health and physical impairments.

Plaintiff filed an application for SSI on January 31, 2013, alleging an onset date of April 20, 1990. His application was denied initially on May 30, 2013, and again on reconsideration. After holding a hearing on his claim, an Administrative Law Judge ("ALJ") issued a decision on January 7, 2015 holding that Plaintiff was not eligible for SSI. On September 11, 2015, the Appeals Council denied Mr. Mockler's request for review. On October 5, 2015, Plaintiff filed a

new application for SSI, alleging an onset date of January 8, 2015. That application was ultimately approved due to Plaintiff's mental health challenges.[1] On October 26, 2015, he also filed the instant appeal of the ALJ's denial. For the reasons outlined below, the Court finds that the ALJ committed legal error by failing to grant appropriate weight to the opinions of Plaintiff's treating psychologist, but **affirms** the ALJ's decision on the ground that this error was harmless.

## II. Factual Background

The administrative record contains evidence of Plaintiff's self-reported symptoms and activities of daily living, as well as extensive medical evidence from Plaintiff's primary care provider, two treating psychologists and several specialists and emergency doctors. Plaintiff reports living alone in a home he co-owns with his mother, sleeping primarily during the day and staying awake at night. Administrative Record ("AR") 50. He also stated that he had no trouble driving, that he is able to do his laundry, mow his backyard when he needs to, and primarily prepares microwave meals. AR 69-70. Nevertheless, he alleges that he has difficulty planning because his back pain is unpredictable, that he has weakness in his right hand, and that he can only walk forty to fifty feet and stand for ten to fifteen minutes.AR 53. With regard to his social and emotional life, he reports spending time with his mother and two online friends who live across the country, but otherwise having no ongoing social contacts. AR 63. At the November 25, 2014 hearing before the ALJ, Plaintiff stated that he doesn't leave town because he gets "nervous shaking," and that he doesn't "really go anywhere except to the store at night if [he has] to go to the store." AR 51. He also reports that he just "[doesn't] like being around people," has "been like that since [he] was a teenager" and has never had any close friends. AR 51, 61-62.

---

[1] The Court's review in this case is limited to the Commissioner's January 7, 2015 decision. *See* 42 U.S.C. § 1383(c)(3). Therefore, for purposes of this review, the Court will not consider evidence from Plaintiff's second application which does not form part of the administrative record in this case.

Plaintiff's medical records from his primary care provider, Dr. Evans, corroborate his social limitations, but suggest that his physical impairments are not particularly severe and that Plaintiff has been unmotivated in complying with treatment.[2] For example, throughout this time, Dr. Evans noted that Plaintiff reported low back pain but was relatively functional. In June 2010 he stated that "patient is able to walk without difficulty. He is able to bend at both hips to 90 degrees. He is able to stand on each leg without difficulty. There are no signs of [back] trauma. No tenderness to palpation." AR 360. In November 2010, Plaintiff complained about increased discomfort with pinprick along the lateral distal left leg, but Dr. Evans noted "no signs of trauma, no tenderness to palpation, deep tendon reflexes of the knees and ankles, no muscular atrophy or loss of strength," and stated that Plaintiff was able to walk without difficulty. AR 367. In December 2010, he noted that Plaintiff's back pain was "dramatically improved though still an issue from time to time." *Id.* In November 2013, Plaintiff again reported low back pain, but Dr. Evans noted that he was "able to walk without obvious defect" and that "there is some palpable tenderness along the posterior proximal left leg reproducing [a] cramping sensation." AR 431. The doctor prescribed pain medication. In May 2014, Dr. Evans reported sciatic notch tenderness in the left buttocks with palpation, but his assessment was that the Plaintiff's challenges were "primarily emotional issues." AR 451. In August 2014, Plaintiff again requested narcotics for his back pain. Although Plaintiff's physical exam results again include sciatic notch tenderness in the left buttocks, Dr. Evans denied the request for pain medication. AR 490-93.

Plaintiff also complained about left knee pain during this timeframe. In June 2012, Dr. Evans noted a tender medial aspect, but stated that his range of motion and stability was "ok,"

---

[2] Dr. Evans provided notes from about 30 visits with Plaintiff between March 2010 and August 2014.

and assessed his knee pain as "chronic but stable" with intermittent narcotic use. AR 358-361. He reiterated these concerns in December 2012, but Dr. Evans' physical exam noted that his hip, knee and ankle stability were normal, that there was no joint or limb tenderness to palpation and no edema (swelling). He also noted that Plaintiff would rather have intermittent narcotics than return to the orthopedic surgeon for his knee, but "he knows this cannot be an ongoing prescription." AR 348-350.

In addition, Plaintiff complained about hand pain. In September 2012, Dr. Evans found Plaintiff's light touch sensation was reduced in the left finger, but noted that Plaintiff's range of motion of fingers and strength was normal. AR 354-357. In February 2013, Plaintiff pulled his hand, and Dr. Evans noted "some tenderness of the right third finger" with some mild swelling and "slight impairment" in right third finger's range of motion with flexion, but non-tender wrist and normal shoulder, elbow and wrist joint stability. AR 343. In May 2013, Plaintiff complained of right wrist pain, and Dr. Evans noted that a prior X-ray had shown some shortening of the ulnar bone, but otherwise no abnormalities. AR 402.

Plaintiff's final physical complaint involved breathing difficulties. When he reported chest pain in June 2010, Dr. Evans noted that "Plaintiff admits that his obesity is a contributing factor," that the pain "is not disabling," that he "has no heart palpitations" and "does okay at rest." AR 369. He ordered a cardio exercise stress test, an echocardiogram and chest x-ray. *Id.* In August 2013, Dr. Evans noted that Plaintiff had a history of restrictive airway disease with no response to bronchodilator. He noted that "patient simply feels winded with any type of exertion," but noted no cyanosis, no chest pain, no sputum production or coughing." His physical respiratoy exam was normal. Dr. Evans prescribed Spiriva and ordered a chest X-ray "to rule out other possibilities," although he surmised that age, obesity and hot weather were responsible for

his breathing troubles. AR 408-411. Fifteen days later, he noted that Plaintiff was happy about improvements to his breathing on Spiriva, and in November, he stated that Plaintiff's breathing was "relatively stable" on that medication. AR 433. Finally, over the years that Dr. Evans treated Plaintiff, he repeatedly recommended that Plaintiff get a sleep apnea study, but Plaintiff consistently failed to follow through. AR 370; 354-57; 428; 438.

In addition to Dr. Evans' notes from Plaintiff's regular visits, the administrative record contains the results of a number of specialists' records concerning his physical ailments. With respect to Plaintiff's chest pain, Dr. Newcomer performed pulmonary function studies and found mild restriction in volumes and flows without post bronchodilator improvement, but reported normal range lung capacity and diffusion. AR 323, 328. A cardiolyte stress test showed normal cardiac results, and an echocardiography showed no distinct regional wall motion abnormalities, but "mildly dilated left atrium and right atrium," and "probable concentric left ventricular hypertrophy with preserved lv systolic function." AR 343. A later 2010 chest x-ray showed "no acute change or active process," AR 379, and 2013 and 2014 x-rays showed no evidence for active cardiopulmonary disease. AR 412; 480. Other cardiac tests performed in 2014 also showed normal results. AR 485; 476-80.

With respect to Plaintiff's knee pain, an October 2010 exam showed "minimal degenerative changes at the medial joint compartment and at the patellofemoral articulation." AR 377. With regard to his back pain, a spine lumbosacral x-ray from October 2010 showed "probable degenerative disc disease L4-L5" and "asymmetric soft tissue density in the left paraspinous region." AR 374; 378. A later computerized tomography showed "abnormality primarily from L3-L5 in the form of calcified posterior spurs," as well as mild stenosis and slight asymmetry in muscles. AR 375-76. Finally, in regard to Plaintiff's hand pain, a March 2013 x-

ray showed basically normal results except ulner minus variance at the wrist and chronic deformity in one joint in the little finger. AR 425. In addition, Plaintiff saw Dr. McLarney, an orthopedic surgeon, for his knee and hand pain in October 2010 and May 2013. On the first occasion, he found mild degenerative joint disease and an ACL deficient knee of six years out, and prescribed an ACL brace and strengthening. AR 323-34. On the second occasion, he found no ecchymosis in right wrist and no point tenderness at the lateral or medial epicondyles, but slight dorsal swelling, pain to palpation, and increased pain with resisted extension. AR 405. He recommended resting, icing and anti-inflammatory medication, as well as occupational therapy. AR 406.

Finally, the record contains two evaluations of Plaintiff's functional capacity, one conducted by Occupational Therapist Joan Van Saun and another conducted by Doctor Luther Emerson. With regard to his hands, Dr. Emerson stated that Plaintiff exhibited normal hand dexterity, fair grip strength, and no atrophy of the hands. In terms of his other pains, Plaintiff was tender on the medial aspect of his left knee as well as diffusely in the lumbar area on both sides. However, he exhibited only a slightly awkward gait due to his weight, poor balance, the ability to tandem walk about four steps, positive straight leg raises up to 60 degrees on each side and a fairly normal range of motion. Dr. Emerson diagnosed back pain and injury, asthma, obesity and depression, but noted that, "clearly, the depression is the major issue." AR 391. He noted that Plaintiff's asthma and obesity imposed mild limitations on his activities of daily living.

Ms. Van Saun performed a functional capacity evaluation in October 2014, and filled out a social security form in November 2014. AR 508; 511-519. She reported that Plaintiff was able to sit for up to half hour, stand for up to 15 minutes at one time, and walk for 4 minutes, but could sit 4 hours, walk 30 minutes and stand 1 hour over the course of an 8-hour work day. She

described additional postural, lifting and manipulative limitations. His present work capacity was described as "below sedentary." Finally, state agency consultant Dr. Leslie Abramson reviewed Plaintiff's records and provided an opinion on his residual functional capacity on May 16, 2013, before Ms. Van Saun's exam took place. AR 103-05; 108. She found that Plaintiff could perform work at the sedentary level, and generally found Plaintiff's standing, walking and sitting capacities to be less limited than Ms. Van Saun did.

ii.    *Mental health challenges*

In addition, Dr. Evans' records provide an ongoing assessment of Plaintiff's mental health disorders, demonstrating worsening symptoms over time. In 2010, Plaintiff was described as "doing quite well" with his chronic depression, with no increase in symptoms. AR 367-70. In April 2011, Dr. Evans noted that Plaintiff had been more depressed in recent months and had felt less able to bounce back, but that his anxiety remained under control with medication. After that dip, his depression improved and stabilized. AR 364, 365. Dr. Evans noted that Plaintiff had "a lot of marital problems," went through a mid-life crisis when he turned 40 and was never able to reconcile with his wife. AR 362. In the middle of 2012, his depression was described as mild and well-controlled by medication. AR 358-61; 354-57. He expressed resistance about starting talk therapy because he was previously rejected by a counselor. AR 352. Dr. Evans spent time discussing "his grieving process," and Plaintiff "finally did admit that he needed to" start therapy. AR 353. In December of 2012 and January 2013, Dr. Evans continued to encourage him to start therapy, but Plaintiff failed to do so.  In February 2013, his major depressive disorder was listed as "moderate," and Plaintiff had scheduled a therapy appointment. Dr. Evans stated that "although [Plaintiff was] still feeling down, he is functional." AR 343.

By May of 2013, however, he had abandoned the therapy he briefly began in February. AR 403. He continued to "suffer[] from lack of socialization " and remained "significantly depressed" in August of 2013. By 2014, Plaintiff began to exhibit signs of paranoia and was "completely clos[ed] to getting any talk therapy." AR 441. His major depressive disorder was still listed as "moderate," however. AR 445. Although Plaintiff continued to interact primarily with his mother, Dr. Evans' notes indicate that that this relationship was far from a healthy social influence. Rather, Plaintiff's mother appeared to be manipulative and abusive, and Dr. Evans reports speaking to Plaintiff about setting boundaries with her repeatedly. In June 2014, Dr. Evans reported having "a very frank conversation" with Plaintiff about his lack of engagement in therapy. AR 500-502. Plaintiff began treatment at Brattleboro Retreat shortly thereafter.

Moreover, Plaintiff received limited, intermittent treatment from two mental health providers: Licensed Clinical Mental Health Counselor Gail Peach and Sandra Campbell, Ph.D. The administrative record contains notes and opinions from each of these, as well as intake notes from Brattleboro Retreat, where Plaintiff received outpatient treatment from Dr. Campbell. Ms. Peach saw Plaintiff once in February and once in March of 2013. She diagnosed him with moderate major depression, adjustment disorder (related to his divorce finalization), generalized anxiety with agoraphobia, and tentatively noted PTSD and panic disorder as diagnoses that would need to be ruled out. She reported that Plaintiff has "occasional panic attacks when he perseverates [regarding] being with people," that he "spends the majority of his time sitting alone at home and crying at this point," and that "in session he is tearful, feeling hopeless, and expressed anger at his family for discounting him." AR 381. She noted a score of 55 on the Global Assessment of Functioning ("GAF") scale, signaling moderate symptoms or difficulties in functioning.

A Brattleboro Retreat intake clinician, Dr. Murphy, assessed Plaintiff with depression and anxiety, and indicated that he was "reclusive much of the time" and exhibited "some delusional content." AR 470. She noted that Plaintiff's father was a diagnosed schizophrenic, and referred him to Dr. Campbell for therapy. AR 468. Dr. Campbell had evaluated Plaintiff once in 2013, and began therapy with him in the fall of 2014. In May 2013, she diagnosed him with social anxiety, and tentatively noted depressive disorder as a diagnosis that would need to be ruled out. She also indicated a score of 55 on the Global Assessment of Functioning ("GAF") scale. AR 397-400. In September of 2014, she stated on a social security form that Plaintiff "suffers from a longstanding, but increasingly debilitating, anxiety disorder (generalized anxiety disorder) along with avoidant personality disorder, both of which produce extreme discomfort in situations where he has to deal with people or any type of social situation. Any sort of change, or new situation, exacerbates his anxiety. It appears that he has become more reclusive in recent years, since his wife sought a divorce." AR 473. She reported marked limitations in Plaintiff's ability to make judgments on simple work-related decisions; extreme limitations to understanding and remembering complex instructions, carrying out complex instructions, and making judgements on complex work-related decisions; moderate limitations in understanding and remembering simple instructions and in carrying out simple instructions; "marked" inability to interact appropriately with supervisors, co-workers, and the public and "extreme" inability to changes in a routine work setting. AR 473-74. Her progress notes from that period are consistent with this assessment. AR 503-06. Finally, Dr. Campbell responded to a set of interrogatories consistently, finding severe functional limitations due to Plaintiff's mental health. AR 92-94; AR 520-522.[3]

---

[3] Plaintiff asserts that the ALJ failed to consider these interrogatory responses. However, the ALJ referenced Dr. Campbell's opinions generally, and stated that he evaluated the evidence in the record. Since these allegedly-missing interrogatory responses appear twice in the administrative record, the Court assumes they were available to the ALJ.

Finally, state agency consultant Dr. Edward Hurley reviewed Plaintiff's records on May 28, 2013, before Plaintiff showed signs of paranoia and prior to his treatment at Brattleboro Retreat. AR 105-107. Dr. Hurley found that Plaintiff was limited "for consistent 4+ step instructions" but "retains the memory/comprehension for 1-3 step" instructions. AR 106. He also stated that Plaintiff "can be disrupted by increases in depressive/anxiety [symptoms] but he is responsive to meds and, with social restrictions, he retains the [concentration, persistence and pace] for 1-3 step tasks for 2 hours over an 8 hour period throughout a week." *Id.* His ability to interact appropriately with the general public was described as "markedly limited," and his ability to accept instructions and respond appropriately to criticism from supervisors was "moderately limited." *Id.* He also had a moderately limited ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Dr. Hurley wrote that Plaintiff was "limited for most public contact," "for intense and/or frequent interactions," but retained "the social capacity for brief, routine interactions with supervisors and coworkers." AR 107.

### III. ALJ Decision

The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. In reaching his decision, the ALJ applied the five-step sequential evaluation process established by the Social Security Act to determine whether an individual is disabled. 20 C.F.R. § 416.920(a). The Second Circuit has "tracked this methodology … as follows:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.

---

Moreover, Dr. Campbell's responses appear to be generally consistent with her other records from 2014, noting Plaintiff's worsening symptoms.

3. If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps."

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000).

Thus, at the first step of this evaluation process, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since January 31, 2013. At step two, he found that Plaintiff had the following severe impairments: obesity, low back condition due to lumbosacral degenerative changes; asthma/restrictive airway disease; social anxiety disorder; and depression. AR 20. He found that Plaintiff's alleged sleep apnea, hypertension, and pain in his wrist, elbow and knee did not constitute severe impairments. He looked especially to Dr. Emerson's findings on elbow and wrist pain, x-ray results on Plaintiff's knee and wrist pain, and Plaintiff's normal cardiovascular exam results. He further noted that Plaintiff had failed to attend sleep studies.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. He considered Listing 1.04, concerning disorders of the spine, but concluded that Plaintiff's activities of daily living and Plaintiff's lack of an assistive device for ambulation suggested that his lumbar impairment did not rise to the level of this listing. Nor did Plaintiff's records suggest that his breathing difficulties rose to the level of Listing 3.02 or 3.03. Finally, the ALJ found that the criteria of Listings 12.04 and 12.06, concerning anxiety and depression, were not met. He

found that Plaintiff exhibited mild restrictions in his activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence or pace and no episodes of decompensation. Rather than focus on the clinical findings made by Dr. Evans, Dr. Campbell or Ms. Peach., he looked primarily to Plaintiff's activities of daily living to reach this conclusion.

At step four, the ALJ first found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR § 416.967(b) with the following additional limitations: "he can stand for up to 4 hours per day, sit for up to 6 hours in an 8-hour workday, and stand/walk for up to four hours in an 8-hour workday. He can occasionally climb ramps and stairs, but can never climb ladders, ropes or scaffolds. He can occasionally balance, stoop, kneel, crouch and crawl. He should avoid exposure to fumes, dust, gases, odors and other pulmonary irritants. He should avoid extended exposure to dangerous machinery and unprotected heights. Work is limited to 1-3 step instructions. He can maintain concentration to perform tasks for 2-hour blocks during an 8-hour workday. Lastly, he can work by himself with superficial interaction with his supervisor, but should not deal with people face to face around in the same environment. Lastly, he should interact with the public." AR 23-24. In reaching this conclusion, the ALJ held that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible. Specifically, Plaintiff's back pain was greater than expected in light of the objective evidence in the record, and his breathing difficulties did not appear to have a serious medical basis. AR 25-26. With regard to Plaintiff's mental health limitations, the ALJ found that early records from Dr. Evans, Ms. Peach and Dr. Campbell suggest that Plaintiff's symptoms were moderate. Moreover, to the extent that Dr. Campbell later opined that his mental health problems were more severe, these opinions were minimal and did

not match her therapy notes. Finally, the ALJ noted that Plaintiff's ability to travel to Ohio to develop a romantic relationship, as well as his interactions with his mother and online friends, were inconsistent with the social limitations he alleged. AR 28. The ALJ gave great weight to the opinions of Dr. Abramson, Dr. Hurley and Dr. Emerson, and little weight to Ms. Peach, Ms. Van Saun, Dr. Campbell, and Plaintiff's mother. He did not explain how much weight he granted to Dr. Evans, Plaintiff's primary care provider.

After finding that Plaintiff had no past relevant work, the ALJ found at step five that, considering Plaintiff's age, education, work experience and residual functional capacity, there are jobs in significant numbers in the national economy that Plaintiff could perform. AR 32. He therefore concluded that Plaintiff was ineligible for SSI.

## IV. Standard of Review

Review of disability determinations of the Commissioner of Social Security involves two levels of inquiry. *Baybrook v. Chater*, 940 F. Supp. 668, 672 (D. Vt. 1996). First, the Court must decide whether the Commissioner applied the correct legal standard. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987). If the ALJ did not properly apply the correct legal standards, the court will remand the case for agency reconsideration unless the application of the correct legal principles could lead to only one conclusion. *Johnson*, 817 F.2d at 986. However, "courts have held that ALJ error which does not negate the validity of the ALJ's ultimate conclusion is harmless and thus does not warrant reversal." *Fitzgerald v. Astrue*, Case No. 2:08-CV-170, 2009 WL 4571762, at *8 (D. Vt. Nov. 30, 2009) (citing *Batson v. Comm'r of Soc. Sec.,* 359 F.3d 1190, 1197 (9th Cir.2004); *Dye v. Barnhart,* 180 Fed. Appx. 27, 30 (10th Cir.2006)).

The Court must then determine whether the ALJ's decision is supported by substantial evidence. *Id.* at 985. Substantial evidence is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401 (1971).

The Court must consider the whole record, and that which detracts from the weight of the

evidence must be considered in determining whether substantial evidence supports the findings.

*Williams v. Bowen*, 859 F.2d 255, 258. The ALJ's decision need not "reconcile explicitly every

conflicting shred of medical testimony" in order to be supported by substantial evidence, but the

ALJ may not unreasonably reject "all the medical evidence in a claimant's favor" in reaching her

conclusion. *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir.1983) (quotations and citations

omitted). District courts must "consider the fact that the Social Security Act is a remedial statute

to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir.

1981).

## V. Discussion

Plaintiff asserts that this Court should remand the ALJ's decision because the ALJ (1)

failed to grant appropriate weight to Dr. Campbell's opinion and to consider her interrogatory

responses; (2) failed to fully apply Dr. Emerson's opinion, even though he purported to give it

great weight; (3) failed to give appropriate weight to Ms. Van Saun; (4) reached a conclusion

about Plaintiff's RFC that was not supported by substantial evidence; (5) judged Plaintiff's

credibility inappropriately; (6) erroneously concluded that Plaintiff's right hand and wrist pain

and his sleep apnea constituted severe impairments, despite contrary evidence. None of these

arguments provides a persuasive justification to remand the ALJ's decision for agency

reconsideration.

*(1)     ALJ failed to give appropriate weight to Dr. Campbell's opinions, but error was*
*harmless*

Although the ALJ relied on Dr. Campbell's opinion from a consultative examination in May of 2013 in reaching his determination of Plaintiff's residual functional capacity, he gave her 2014 social security opinion little weight. AR 27; 31. He explained that the latter opinion was "internally inconsistent with [Dr. Campbell's] own findings that the claimant appears capable of performing all activities of daily living and that he traveled to another State in the hopes of developing a romantic relationship." AR 31. In addition, he was persuaded by the state agency's mental health professionals (namely, Dr. Hurley) "that claimant is not as limited by his psychological issues as Dr. Campbell's [sic] opined." *Id.*

The ALJ's assignment of "little weight" to Dr. Campbell's 2014 opinion constitutes legal error. Pursuant to 20 C.F.R. § 416.927, the agency must grant a treating source's opinion controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. The agency must provide "good reasons" for the weight it grants a treating source's opinion. Where a treating source's opinion is not given controlling weight, the agency looks to the following factors: (i) the length of the treatment relationship and the frequency of examination (granting greater weight when the source has seen a claimant long enough to have obtained a longitudinal picture of his or her impairment); (ii) the nature and extent of the treatment relationship (granting greater weight when the source has actually provided treatment, rather than merely an opinion, and evaluating the kinds and extent of examinations and testing the source has performed or ordered); (iii) how well-supported the opinion is by relevant evidence; (iv) any other factors the claimant brings to the agency's attention which tend to support or contradict the medical opinion, including the source's familiarity with disability programs and his or her familiarity with other information in the claimant's case record. *See* 20 C.F.R. § 416.927.

Dr. Campbell provided two sets of opinions, once as a consultative examiner before Plaintiff was referred to her for treatment by Brattleboro Retreat, and once after her treatment relationship with the Plaintiff began in 2014. An opinion is considered to be from a "treating source" if the medical evidence establishes that the claimant sees, or has seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the claimant's medical condition. 20 C.F.R. § 416.927(a)(2). Thus, Dr. Campbell's latter opinion should have been considered an opinion of a "treating source," since it was issued after Plaintiff began bi-weekly therapy sessions with Dr. Campbell in August 2014. By late November of 2014, Plaintiff had seen Dr. Campbell 6 to 8 times. AR 61.

Moreover, the ALJ's determination that this latter opinion was inconsistent with other substantial evidence in the record fails to account for the evolving nature of Plaintiff's mental health conditions. In fact, Dr. Campbell's 2013 opinion, stating that Plaintiff suffered from more moderate mental health limitations, is consistent with Ms. Peach's evaluation of Plaintiff in the early months of 2013 and with Dr. Evans' ongoing assessment of Plaintiff's anxiety and depression. As Dr. Evans noted, however, Plaintiff's depression and mental health challenges stemming from his lack of social engagement became worse in the latter half of 2013 and into 2014. Although in December of 2012, Plaintiff reported "feeling a lot better" emotionally, Dr. Evans described him as "more down" in February 2013, "suffering from a lack of socialization" and "significantly depressed, [with] no enjoyment in life" in August 2013. Plaintiff described paranoid thoughts about death panels and government surveillance by February 2014. In late 2014, Dr. Evans noted that Plaintiff was "very distressed" and remained "very enmeshed with his mother and feeling unable to change that relationship." AR 490. Thus, Dr. Evans' records suggest that Plaintiff spiraled downward between late 2013 and 2014. Dr. Campbell's records,

which suggest moderate symptoms in 2013 and more severe limitations in late 2014, are consistent with this overall medical picture.

Moreover, Plaintiff's reported social activities do not provide evidence of less severe limitations, as the ALJ suggested. Although Plaintiff did have contact with his mother, Dr. Evans' treatment notes suggest that this relationship was quite problematic and complex, with his mother exhibiting manipulative behavior. The record as a whole suggests that Plaintiff's family history was also troubled, including a schizophrenic father and a sister who had alienated herself from the family for 25 years. Outside of his family relations, Plaintiff reported having no other contact (and aggressively avoiding such contact) in person with any other human, except for a single incident in 2008 where he visited a woman in Ohio. Dr. Evans described an "emotional affair" as part of a mid-life crisis that led to Plaintiff's inability to "reconcile with his wife." AR 362. As noted above, Plaintiff's mental health appeared to spiral downward subsequent to his divorce. None of these facts suggest a healthy level of social functioning, and should not serve to override the more studied, expert opinion of a psychologist with a doctoral degree. Thus, the ALJ erred in granting Dr. Campbell's opinions limited weight.

Nevertheless, even if the ALJ had granted Dr. Campbell's opinions controlling weight, they would not lead to a different outcome. Dr. Campbell's assessment of Plaintiff's more severe limitations was based on her treatment relationship beginning in late 2014. Her prior opinion in 2013 evidenced more moderate symptoms, and was consistent with the ALJ's finding that Plaintiff's mental health challenges did not meet or medically equal the criteria of Listings 12.04 and 12.06, as well as with the ALJ's RFC assessment, as interpreted by the Court below. AR 397-400. The Second Circuit has stated that "the nonretroactive nature of SSI benefits require[s] the Commissioner only to determine that plaintiff was disabled as of the date of his . . .

application." *Baladi v. Barnhart*, 33 F. App'x 562, 564 (2d Cir. 2002). Here, Dr. Campbell's

records suggest that Plaintiff's more severe limitations, and therefore his disability, did not arise

until 2014, after Plaintiff's January 31, 2013 application for SSI in this case. Accordingly, since

the ALJ's error did not negate the validity of the ALJ's ultimate conclusion, his error was

harmless and does not warrant reversal. *See Fitzgerald v. Astrue*, 2009 WL 4571762, at *8.

### (2) *ALJ appropriately weighed and applied Dr. Emerson's opinion*

Plaintiff alleges that the ALJ purported to give Dr. Emerson great weight, but failed to

accurately apply the substance of his opinion to his RFC assessment. The ALJ's RFC assessment

found that Plaintiff had more severe standing, walking and lifting limitations, but less severe

postural abilities. As a non-treating source, Dr. Emerson's opinion should be granted weight

according to the following factors: (1) whether he examined Plaintiff; (2) whether he was

Plaintiff's treating source; (3) the nature and extent of his treatment relationship; (3) whether his

opinion was supported by relevant evidence; (4) whether his opinion was consistent with the

record as a whole; (5) whether he offered a medical opinion about issues related to his or her area

of specialty; and (6) any other factors Plaintiff brought to the ALJ's attention which tend to

support or contradict the medical opinion. 20 C.F.R. § 416.927. Here, the ALJ appropriately

considered that Dr. Emerson was a specialist in granting his opinion great weight, but declined to

adopt those aspects of his opinion which he found to be inconsistent with other evidence in the

record. AR 31. Since this determination is consistent with the factors outlined above, the ALJ did

not commit legal error in weighing Dr. Emerson's opinion in this manner. Nor was the ALJ

required to adopt Dr. Emerson's opinion wholesale or reject it in full. *See Matta v. Astrue*, 508 F.

App'x 53, 56 (2d Cir.2013) ("Although the ALJ's conclusion may not perfectly correspond with

any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").

*(3)     ALJ appropriately weighed Ms. Van Saun's opinion*

Nor did the ALJ err in granting little weight to the opinion of occupational therapist Joan Van Saun. The ALJ stated that "Ms. Saun's postural limitations are inconsistent with the medical evidence of record as a whole," and that "the opinions of Dr. Emerson and State agency consultants persuade me that the claimant is not limited to the degree that Ms. Saun has determined." As an occupational therapist, Ms. Van Saun would not be considered an "acceptable medical source" pursuant to the regulatory definition of that term. *See* 20 C.F.R. § 416.902(a). Thus, her opinion should be evaluated according to 20 C.F.R. § 416.927(f). That regulation provides that although the same factors as those listed above apply to weighing such an opinion, "not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source or from a nonmedical source depends on the particular facts in each case." 20 C.F.R. § 416.927(f)(1). Thus, the ALJ's singular focus on the consistency between Ms. Van Saun's opinion and the rest of the medical evidence did not constitute a legal error.

Moreover, the ALJ's conclusion that Ms. Van Saun's opinion was inconsistent with the rest of the medical record was supported by substantial evidence. First, the limitations to Plaintiff's activities of daily living reported in Ms. Van Saun's functional capacity evaluation are more severe than those that appear elsewhere in the record. For example, Ms. Van Saun reported that Plaintiff was unable to mow, but Plaintiff himself acknowledged mowing his lawn regularly and stated that he doesn't do other house or yard work activities due to "lack of interest." AR 508; 70; 224-231. Ms. Van Saun also reported difficulty with getting in and out of a car, as well as

difficulty with self-care and feeding activities. AR 508. In contrast, Plaintiff reported no trouble driving and an ability to take care of his personal needs. AR 48; 69.

With regard to Plaintiff's mobility, Ms. Van Saun reported that Plaintiff could sit for a maximum of 30 minutes, stand a maximum of 15 minutes, and walk a maximum of 4 minutes at one time. Over the course of an 8-hour work day, Plaintiff could sit 4 hours, stand 1 hour and walk 30 minutes. AR 512. In contrast, Dr. Emerson, who also conducted a physical evaluation, found that Plaintiff could stand and walk for at least six hours in an 8-hour day, and could sit with no limitation. Moreover, after reviewing the Plaintiff's medical records, state agency consultant Dr. Abramson also concluded that Plaintiff had a greater capacity to sit, stand and walk than Ms. Van Saun suggested. Accordingly, the ALJ was entitled to conclude that Ms. Van Saun's opinions were contradicted by an examining, acceptable medical source and a consulting source, and to grant her opinions little weight on that basis.

*(4)    As stated, the ALJ's RFC assessment was not supported by substantial evidence, but the errors in his wording were harmless*

Next, Plaintiff contends that the ALJ's assessment of Plaintiff's residual functional capacity was not supported by substantial evidence. He first asserts that the ALJ erred by finding that Plaintiff "should interact with the public" in his RFC determination. Both the Commissioner and the Plaintiff surmise, however, that this statement was a typographical error, and that the ALJ's conclusions at step four of his analysis should have been consistent with the hypothetical that the ALJ posed to the vocational expert at the hearing. AR 80.[4]  At the hearing, the vocational expert testified that if a person with the same physical limitations as those included in the ALJ's RFC were limited to "very limited, superficial interactions," could not "[deal] with people in any face to face manner," and could have "no public interaction whatsoever," he or she could perform the

---

[4] That hypothetical assumed that Plaintiff was limited to only brief, superficial interactions with the public.

job of a security guard, laundry worker and small parts assembler, but could not perform the job of companion. AR 81-82. In fact, the ALJ's step five analysis includes these first three jobs as ones the Plaintiff could perform, and excludes the companion position. Accordingly, if the social limitations in the RFC are in fact a typographical error, the error is harmless because the ALJ's step five analysis (and ultimate conclusion on disability) would not change if the error were corrected.

Thus, the remaining question before the Court is whether this revised mental RFC assessment, based on the hypothetical the ALJ posed to the vocational expert, is supported by substantial evidence. In addition to the social limitations listed above, the ALJ found that Plaintiff was limited to 1-3 step instructions, could maintain concentration to perform tasks for 2-hour blocks during an 8-hour workday, and could work by himself with superficial interaction with his supervisor, but should not deal with people face to face in the same environment. AR 23-24. These limitations are consistent with the assessment of Dr. Hurley, the state agency consulting psychologist. AR 105-107. In addition, the memory limitations are largely consistent with Plaintiff's self-report, in which he states that he is "lost" after one or two-item instructions, but that he prefers written instructions. AR 229. They are also generally consistent with Dr. Evans' treatment notes for Plaintiff's memory troubles, which he attributed to a lack of engagement in complex tasks and lack of sleep (although he doesn't specifically test or quantify Plaintiff's memory level). AR 421; 433. Likewise, they are consistent with Dr. Campbell's evaluation in May of 2013, in which she stated that Plaintiff appeared capable of understanding simple oral instructions and carrying out simple instructions under ordinary supervision. AR 397-400. Her later statement that Plaintiff had moderate (rather than marked or extreme)

limitations in his ability to understand, remember and carry out simple instructions is not logically inconsistent with a finding that Plaintiff is limited to 1-3 step instructions. AR 397-400.

Furthermore, the ALJ's determination that Plaintiff could have superficial interactions with his co-worker but could not "[deal] with people in any face to face manner," and could have "no public interaction whatsoever," AR 81-82, as he posited to the vocational expert, was also supported by substantial evidence. Dr. Hurley stated that he could have brief, superficial contact with co-workers and his supervisor but was limited from "most public contact." AR 107. Likewise, Dr. Evans noted Plaintiff's distrust of therapists and stated that Plaintiff was "suffering from a lack of socialization." AR 411. Ms. Peach stated that Plaintiff "has occasional panic attacks when he perseverates [regarding] being with people" and "spends the majority of his time sitting alone at home and crying." AR 381. Finally, Dr. Campbell's 2013 evaluation, stating that Plaintiff was "bothered by people," "has trouble interacting with people" and "mostly spends time at home by himself," is consistent with these assessments. Although she later reported that Plaintiff experienced "extreme discomfort in situations where he has to deal with people or any type of social situation," she also noted that Plaintiff's anxiety disorder and avoidant personality disorder were "increasingly debilitating," suggesting that his disorders had previously limited his functional capacity to a lesser extent. Although this evidence might lead a different adjudicator to conclude that Plaintiff could not engage even with supervisors or co-workers before his SSI application date in January 2013, the overall evidence adequately supports the more moderate limitations that the ALJ presented to the vocational expert at the hearing.

(5)     *ALJ did not commit legal error by finding that some of Plaintiff's alleged symptoms were not supported by substantial evidence*

Plaintiff also takes issue with the ALJ's assessment of his credibility. "When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotations omitted). Unless the Commissioner applies an incorrect view of the law to the evidence, "it is the Commissioner that resolves evidentiary conflicts and determines credibility issues, and the court may not substitute its own judgment for the Commissioner's." *DiMaggio v. Astrue*, No. 5:10-CV-172, 2011 WL 4748280, at *6 (D. Vt. Oct. 6, 2011) (citing *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir.1998)). The regulations provide a two-step process to evaluate a claimant's assertions of pain and other limitations. 20 C.F.R. § 404.1529. "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier*, 606 F.3d at 49. Here, the ALJ found that the claimant did suffer from such impairments. AR 24. Next, the ALJ must consider the intensity, persistence and limiting effects of the alleged symptoms. The ALJ must consider objective medical evidence, but "will not reject [a claimant's] statements about the intensity and persistence of [his or her] pain or other symptoms or about the effect [the claimant's] symptoms have on [his or her] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529. Rather, the ALJ should consider additional factors.[5]

---

[5] The regulation states that the agency will also consider the following factors "relevant to [a claimant's symptoms]":
(i) [Claimant's] daily activities;
(ii) The location, duration, frequency, and intensity of [claimant's] pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication [claimant] take[s] or ha[s] taken to alleviate [his or her] pain or other symptoms;

Moreover, Social Security Ruling 16-3P provides guidance about how the Commissioner evaluates statements regarding the intensity, persistence and limiting effects of a claimant's alleged symptoms.[6] The Commissioner first considers whether a finding of disability can be made by evaluating a claimant's symptoms solely on the basis of objective medical evidence. If not, it considers "statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in the regulations."[7] In evaluating statements from the individual, the agency considers "whether the statements are consistent with objective medical evidence and the other evidence."

The ALJ's evaluation of the intensity, persistence and limiting effects of Plaintiff's alleged symptoms complied with these legal standards. The ALJ found that the medical history of Plaintiffs' lumbar impairment does not support the severity of his alleged disabling symptoms. With regard to his physical impairments, the ALJ reviewed the relevant evidence and found that (1) the lack of medical treatment for back pain in 2011 and 2012, as well as the routine conservative treatments prescribed for his pain, suggest that claimant's lumbosacral symptoms and limitations are not as severe as he alleged; (2) examination results from Dr. Emerson and from Brattleboro Memorial hospital suggest that Plaintiff did not suffer from a disabling musculoskeletal condition. With regard to his mental impairments, the ALJ found that "his

---

(v) Treatment, other than medication, [claimant] receive[s] or ha[s] received for relief of [his or her] pain or other symptoms;

(vi) Any measures [claimant] use[s] or ha[s] used to relieve [his or her] pain or other symptoms (e.g., lying flat on [his or her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [claimant's] functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529.

[6] SSR 16-3p supersedes SSR 96-7p, cited in Plaintiff's brief. ECF 11, p. 22.

[7] The cited regulation provides a list of what constitutes evidence, and includes evidence from nonmedical sources and prior administrative medical findings. 20 C.F.R. § 404.1513. In rescinding its prior guidance on this question, the agency explained that it was "eliminating the use of the term "credibility" from [its] sub-regulatory policy, as [its] regulations do not use this term. In doing so, [it] clarif[ied] that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3P.

depression and anxiety are no doubt somewhat significant and would have some influence [on] his social interactions to some extent." AR 28. However, he found that "his GAF rating, the objective evidence, and his treatment history do not substantiate his specific allegations." *Id.* Finally, in assessing Plaintiff's credibility, the ALJ "also considered the manner in which claimant engaged in providing testimony at the hearing," and found that Plaintiff's "weak employment history casts serious doubts on his desire to work." AR 29. Thus, the ALJ appropriately considered the consistency between Plaintiff's symptoms and the medical evidence, as well as Plaintiff's daily activities and treatment history, in reaching his conclusion. Although this Court might have reached a different conclusion in weighing these factors, we cannot say that the ALJ committed legal error by taking them into consideration.

(6)    *ALJ appropriately evaluated Plaintiff's right hand and wrist pain and sleep apnea*

Finally, substantial evidence supports the ALJ's determination that neither Plaintiff's sleep apnea nor his right hand and wrist pain constituted severe impairments. For an impairment to be severe, it must "significantly [limit a claimant's] physical or mental ability to do basic work activities," 20 C.F.R. § 416.920(c), and "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 416.909.

Plaintiff alleges that the ALJ ignored Ms. Van Saun's opinion that Mockler could only use his right arm and hand occasionally because of a history of right ulnar nerve injury. AR 513. However, Ms. Van Saun's assessment alone does not establish that Plaintiff's hand injury lasted or was expected to last over a year, and therefore does not establish a "severe" impairment as defined in the regulations. In fact, Dr. Evans' records suggest that Plaintiff complained of wrist pain only over the course of several months in early 2013. AR 343; 402. Moreover, in contrast to Ms. Van Saun's opinion, other evidence in the record suggests that Plaintiff's hand impairment

would not significantly limit his ability to do basic work activities. For example, Dr. McLarney, an orthopedic surgeon, evaluated Plaintiff's hand and wrist pain and found "no ecchymosis," "slight dorsal swelling," and some pain symptoms. He prescribed only resting, icing and anti-inflammatory medication, suggesting that Plaintiff's hand impairment was relatively temporary. AR 406. X-ray results showed that Plaintiff's hand was basically normal except ulner minus variance at the wrist. AR 425. In addition, Dr. Emerson's physical examination showed that "the dexterity of his hands was normal," his grip strength was fair and he had no atrophy of the hands. AR 390. As noted above, the ALJ was entitled to grant greater weight to these opinions than to Ms. Van Saun's assessment. Thus, the ALJ's conclusion that Plaintiff's hand and wrist ailments did not constitute a severe impairment was supported by substantial evidence.

Finally, Plaintiff alleges that the ALJ "had the authority to order additional testing in order to develop the record" on Plaintiff's sleep apnea, but comes short of asserting that the ALJ committed a legal error by failing to do so. "It is the rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009) (citing *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir.1999) (internal quotation omitted); *see also* 42 U.S.C. § 423(d)(5)(B) (providing that ALJ "shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability"); 20 C.F.R. § 404.1512(b) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application "). The ALJ's obligation, however, is limited to making every reasonable effort to helping a claimant get medical evidence from his own medical sources and entities that maintain

his medical sources. *Id.* In addition, the ALJ *may* ask a claimant to attend a consultative examination at the agency's expense. 20 C.F.R. § 404.1512(b)(2).

In this case, however, the ALJ considered records from Plaintiff's treating providers showing their attempt to diagnose sleep apnea. In particular, the record shows that Plaintiff's treating sources repeatedly insisted that Plaintiff obtain a sleep apnea study, but Plaintiff refused to do so. For example, in March 2010, Dr. Evans noted that Plaintiff "simply procrastinated and has no good explanation" for failing to get sleep apnea test. AR 370. In September 2012, Dr. Evans stated that Plaintiff had scheduled an appointment for this study but then pulled out. AR 354-57. In May 2013, he again noted that Plaintiff had taken no action on sleep apnea. In August 2013, he reported that Plaintiff had missed his sleep apnea appointment, and spoke to Plaintiff about the possibility that sleep apnea could be causing his memory impairments. Plaintiff had an initial consultation with sleep doctor Donald Wilson in October 2013, and a sleep study was planned. AR 428. By February 2014, however, Dr. Evans noted that Plaintiff still had not set up the appointment because he forgot to forward his paperwork, which he had recently re-discovered in his car, to the facility where the exam would take place. AR 438. Finally, in August 2014, Dr. Evans again wrote that Plaintiff had not pursued sleep apnea studies as requested previously. Thus, the ALJ reviewed and relied on extensive records from Plaintiff's medical sources, and was not obligated to assist Plaintiff in getting additional records. Moreover, in light of Plaintiff's refusal to obtain an evaluation for his sleep apnea, the ALJ appropriately concluded that Plaintiff had failed to meet his burden in establishing that his sleep apnea constituted a severe impairment.

## VI. Conclusion

For the foregoing reasons, the Court grants the Commissioner's motion to affirm her decision, and denies the Plaintiff's corresponding motion. ECF No. 13; ECF No. 9.

Dated at Burlington, in the District of Vermont, this 3rd day of May, 2017.

<u>/s/ William K. Sessions III</u>

William K. Sessions III
District Court Judge